Case No. 15-1453 et al. PJM Power Providers Group Petitioner v. Federal Energy Regulatory Commission Mr. Coretta for the petitioner, Mr. Nathan for the respondent, and Mr. Flynn for the intervener. All right, Mr. Coretta. May it please the Court, PJM accepted an unreasonably low value for the construction cost of a hypothetical combustion turbine generating plant, a value we call the cost of new entry, and which is an important determinant in the PJM capacity market design. As a result, approximately 170,000 megawatts of capacity in PJM have cleared and understated values for three auctions held thus far, and this will occur in a fourth auction next year unless this Court takes orders under review. The evidence failed to meet the substantial evidence standard and failed to respond to the reasonable objections of petitioners with respect to the labor cost value and the cost of funds, both of which are important in setting the cost of new entry. And in addition, petitioners and other protesters were unfairly treated and disadvantaged in the proceedings before FERC because so much of the evidence relied upon by FERC lacked a discernible evidentiary foundation and FERC did nothing to correct that deficiency. The most impactful deficiency associated with the labor cost relates to the labor or base labor hours value, which is essentially the amount of time it takes to construct the reference combustion turbine generating unit under an idealized set of conditions. FERC relied primarily on the STANTEC report, which was not in the record and which could not be properly evaluated by petitioners or protesters because it just didn't supply any evidence regarding what its source data was. Can you clear up something for me? Did your clients or anyone else ever request access to that data below? Your Honor, we requested that a hearing be held regarding this matter and some other aspects of the So I'm not, you know, an expert on how these things work. So is having a hearing the only way where you might be able to have access to the data because if you had a hearing that a witness would testify and you would be entitled to whatever discovery of whatever or to see whatever materials they were relying upon? Yeah. The applicant had no obligation to supply us with any information regarding the source of the STANTEC data outside of the commission's procedural rules. And that would have required a hearing. Okay. Thank you. Thank you. So as I said, the STANTEC report was the most impactful. Although FERC has claimed that this is well supported in the record, a simple inspection of essentially one sentence in a different report, the regarding the base labor hours. And all that really says is that they looked at some construction proposals and had input from other contractors. But it doesn't tell us who they were, what they asked them to provide. The situation we've encountered here is actually very similar to the one that the court encountered in Susquehanna International Group versus Security Exchange Commission, where the court remanded findings back to the agency because it was relying upon a consultant's report that it had no foundation for. Can you go to the proposed cost of capital value? One of your arguments is that FERC failed to address your argument, your claim with respect to project level financing risk. Yes. Based by private equity. Yes. Play out your argument for us. Sure. What petitioner's consultants showed below, and FERC didn't contest this, was that 70% of the new gas fire generation being constructed in PJM was being constructed by private equity funds. Thank you. I appreciate that. And our experts also contended that these funds would experience project finance risk because they don't have a portfolio of assets to fall back on. And they provided a demonstration that private equity funds typically require higher returns than traditional entities, publicly traded entities like independent power. Okay. Now, FERC's response is what, in your view? FERC's response is they said two things, really. They said they used the best available public data, which we disagree with because we did provide data which was publicly available regarding what private equity funds expected to receive. But their primary argument was that they made an adjustment for what they call merchant risk. But merchant risk is not the same as project finance risk. And that's demonstrated by the fact that the information FERC relied on to figure out what the merchant risk was only looked at companies that had portfolios. So they failed to take account of this risk associated with a project financing entity. The merchant companies are not coterminous with the private equity entities. That's correct. They are not. I want to make sure I understood that was your argument, what they have to say about it. And so if you're basing the disposition on that merchant group, that's not capturing the group to which you're referring. What you say is providing the largest amount of work here. That is absolutely correct. And, you know, we are relying upon petal gas storage for the proposition that a proxy group needs to be risk appropriate, which this one was not, or else adjustments happen. What was your evidence about the return on capital required by private equity funds? There was an outfit called Cambridge Associates does publish data regarding what these funds receive. Were they disaggregated between energy production sources and other kinds of returns on private equity funds? I believe the data they provided only in one instance was related to this industry. So it could be everything from private equity fund that takes over a casino in Las Vegas to a private equity fund that takes over some other company and eliminates a lot of workers. That's correct, Your Honor. So that doesn't really help very much with respect to return on capital required for a power generation. Well, Your Honor, FERC did not dispute our contention that private equity required higher returns. No, but I dispute that you don't have evidence as to what that higher return is with respect to power generation. I think what petal gas storage stands for is that the proxy group needs to be risk appropriate. It needs to be as good as FERC can come up with with the evidence available. And if you don't provide it with evidence specific to power generation, then it doesn't seem to me that it's necessarily inappropriate for them to look at other data that's available. Your Honor, I would say that if that's what they were going to do, that they had to demonstrate. And by the way, the witnesses attempted to do this, but FERC never made any findings on it. They would have to demonstrate that private equity funds and project finance risk was not incremental to what they call merchant risk. And they didn't make that demonstration. So I think they're in the position where they've essentially acknowledged that there is this higher risk out there. And they say they don't know what it is. And we requested that a hearing be held so that that could be further analyzed. Well, you could have put in more evidence on the subject. When you say that a hearing, nothing stopped you from putting in evidence specific to power generation. We put in, there was at least one of the pieces of evidence we put in was just in this industry, in the energy industry. I think that was about a 19% return. They agreed that there was greater risk, and for that they added a 1.3% addition, correct? They picked the midpoint of the range based upon merchant generation. So they did not take account of any incremental risk associated with project financing. Didn't they also look at the possibility of hedging? They looked at the possibility of hedging with respect to merchant entities. Interveners argued in their brief that they looked at hedging in connection with this project finance risk. And as I alluded to earlier, the witnesses did make some statements regarding that. But FERC never made any findings. Interveners have essentially, I think, acknowledged that there's a hole here. But FERC never filled the gap. With respect to private equities cost of required return, your projection was 13.8%, is that right? No, that was FERC. That was PJF. Rattled back into 13.8%. Yours was 14.1%. No, I don't think so, Your Honor. We recommended one between, our witnesses recommended one between 15 and 20%. When you sit down and come back for a bottle, if you could get me that page, that would be helpful. Sure, I can do that. I see I'm running out of time. Are there any further questions? No. Okay. Thank you. Good morning, Your Honor. Adam Viswanathan on behalf of the Commission. So it looks like there's been a number of questions about the cost of capital determination. So maybe I'll start there. Just to step back, I mean, under Section 205 of the Federal Power Act, the Commission considers the proposal that's been presented to it, and evaluates that proposal for whether it is just and reasonable. The Commission here agreed with PJM's view that private equity data was a poor proxy for estimating the cost of capital attributable to owning and operating a merchant-generating facility. The Commission agreed with PJM's expert testimony on this point. Why? Because private equity portfolios, the record reflected that those portfolios were diversified into many different industries, not just energy. But the numbers indicate that private equity and power generation, they were substantially involved in what we're talking about, right? So I understand that petitioners have argued that most of the new construction was funded by private equity firms. Right. From the Commission's perspective, the question is whether the cost of capital appropriately captures the risks associated with constructing merchant-generating facilities. And so in the Commission's view, it agreed with what PJM had proposed because of the fact that the cost of capital that PJM proposed was specific and it was attributable to merchant generation, not to other industries. We also have testimony in the record. I think you're walking past what I'm trying to figure out. They put in evidence to indicate that most of the new construction was being done by the large, by the private equity entities. That's right. So it's no answer for you to refer me to the merchant generation. It's a much lower—their percentage of contribution to the new construction is much lower than the private equity. So we're still back to the question of how to get rid of their claim that there's a higher rate for return that should be paid to private equity. So part of the problem here is— In other words, there's no answer to me. At least I can't sort it out. You're not explaining to me a way to explain it. To say that some private equity entities are inappropriate for us to look to because of other things. Well, but so what? Because 70% of what's being done is by private equity groups. So I think the record reflects, and the commission cited to testimony on this point, that you determine a cost of capital by how the capital is being used. It's not the source of the financing. It's not the source of the funding. So in the commission's view, the fact that, let's say, the majority of the new construction is being funded by particular entities, that doesn't tell us that the cost of capital should reflect what those entities expect in terms of return. Are you just teaching me, or are you repeating what the commission said? So that is in the record, Rob. I will refer you to—this is JA820, I believe. In other words, something that tells me that the commission addressed the argument head-on and said we're not buying the argument that 70% of the new construction is private equity, and so we're moving from there. I mean, is that what you're saying there, Simon? So I think that the issue here is that the commission viewed the way that PJM calculated the risks as appropriately capturing the risks that are attributable to how the capital is being used. It doesn't mean anything to me, in all due respect. I mean, I hear the words, and as a general matter, I know what you mean to say, but I don't understand this context. They made a specific claim with respect to high rate of return because private equity entities are doing 70% of the new construction. So that's kind of a simple, straightforward presentation, and there could be flaws in it, but what flaws are being pointed to by Friday? So I can point you to 730, JA730, this is paragraph 82, and there's also a footnote in that paragraph to the expert testimony by Brattle. That testimony points out, and what the commission said was that because of the fact that the portfolio is considered many different industries, it was a poor proxy for determining the cost of capital for how the capital was being used. And that's what they said at paragraph 82. The expert testimony that they're saying, that's the Brattle report, and that can be found at JA630. And so what this page reflects here is this notion that the fact that a private equity firm may choose to diversify into many different industries might be an appropriate investment strategy, but in terms of a cost of capital, it's not something that you reward because it's a voluntary choice. And I think that's what Brattle's testimony reflects. I think it's also, there's a difference between calculating the cost of capital and its components, which is necessarily forward-looking, versus an entity like a private equity firm saying, we have actually earned X percentage looking backwards. So the cost of capital is to look forward. It's intended to be an estimate. It doesn't mean that whatever the private equity firm or some other entity happened to earn in the marketplace would be what they get as a cost of capital. And I'll return back to the risk point that I think someone else on the panel raised. The commission agreed that the way in which Brattle quantified the risks was appropriate because Brattle looked at a number of different reference points. One of those reference points was large, publicly-traded energy firms. And Brattle explained that the commission agreed at this point that a merchant-generating facility is going to face higher risks than a large, publicly-traded firm, in part because of the ability to hedge. And so a large, publicly-traded firm would have long-term contractual agreements in place to hedge some of that risk. And so a merchant-generating facility would not have that opportunity, so its risks would be higher. But at the same time, it would have some ability to hedge risk in the medium term. And so in Brattle's view and its expert judgment, it found that 8% would appropriately capture the higher risks faced by a merchant-generating facility. And that was right sort of in the midpoint of all the various reference points they looked at.  Not specifically, Your Honor. I think what Brattle explained was that they did not include private equity sources for a couple of different reasons. We've talked about the poor proxy point. They also noted that private equity data is not observable in the marketplace. And so part of the commission's reasoning for accepting Brattle's methodology was that it viewed it as transparent and based on verifiable public data. Why could it be a poor proxy if it's 70% on the construction? I thought your argument is that the only evidence about how much private equity has has to do with their entire portfolio of everything. And so even if they're 70% in power, we don't know what return they expect on power that's part of their own diversification of portfolios. Maybe they get 1%, and that's good enough because they're betting on 1,000% on a casino. And so it's just not an acceptable proxy to pick a private equity funds portfolio. Isn't that what they say? Is that what Burke said? I mean, I understand that concept. I'm just trying to figure out where Burke says this. Well, so I think Burke said, I think Chief Judge Garland's point is a good one. The idea that we're not going to write an opinion about his opinion. Isn't that exactly what's in paragraph 82 of Burke's opinion at 730? That's exactly right. And then exactly what's in the expert's affidavit at JA 630? That's exactly right, Brian. And this is the idea that we can't separate out the various pieces of the private equity data. And I think an earlier point you made, Chief Judge Garland, is a good one, that the petitioners could have offered a specific source of data that was sort of unique to energy, the energy industry from private equity firms. They didn't do that. What they offered, I think we pointed this out in our brief at page 40, they offered some expert testimony from, well, this is their, we cited their brief at page 63, which cites expert testimony from JA 437 to 438. They sort of described a few different sources of private equity information. One of them was, quote, certain states' pension plans that report individual returns associated with their investments in certain companies. But that level of generality, it's pretty hard to get anything specific to the energy industry. The problem with the, I hear what you're saying, and I understand that FERC has responded, as the Chief Judge says, the problem is, I think implicit in their argument, there are cross-generalizing effects in private equity in part of the response, and maybe it was on them to point this out, that we don't operate by disaggregating all. We have a number of different investments, and the only way we can be seriously in play here is by having these other investments, too. I don't know how you sort that out, but their argument, bottom line, is we have to have a higher rate of return in order to be here. Otherwise, we're not here, and so who's going to fill the 70% that we leave? That's essentially what their argument is. So I don't buy the argument that a piece of their portfolio, that is power generation, isn't at the same level of risk, because I think it's cross-fertilizing in these private equity firms. I don't think they sit and limit. They're looking at investment A, B, C, and D, and that's how they're operating, and they're essentially saying we have to have the higher percentage of return. Otherwise, we're not in this market. That's essentially what their argument, I think. I think that's right. I mean, I think part of the problem is we just can't observe. You're saying they haven't shown it. They haven't shown it. That's exactly right. And I think that from the commission's perspective, coming back to Section 205 and what it requires, the commission looks at the proposed cost of capital that's presented to it, and so even if there's a better, more accurate way of coming to that number, the question is whether the number that's presented to the commission is just and reasonable. I think the commission gave several explanations based on record evidence as to why it approved of PJM's choice of 8%. It was the poor proxy point, and they cited expert testimony on this point that there's just not enough information out there as to how much of the private equity firms is attributable to power generation. I think actually the expert testimony said that the majority of those private equity portfolios are not in merchant generation. They also point out that they agreed with how PJM captured the higher risks of a merchant generating facility relative to large publicly traded firms. And I think there was also sort of a distinction in this idea of project-level financing versus sort of corporate-level transactions, and the commission also pointed out that that distinction was not relevant because of the fact that, as I mentioned, Brattle looked at a number of different reference points. Some of them were not just limited to corporate-level data. For example, there was corporate transaction data that priced merchant generation divestiture. So that's all the sort of record evidence that the commission relied upon for this point. I know that there was also some questions on the ability for the petitioners to access the data, specifically the hours estimate. The labor hours estimate, yes. Yeah, and so I think what I would say to that, Judge Wilkins, is that, first of all, that base labor hours estimate is not the only thing the commission was considering. What it was considering was whether PJM's adoption of the market monitor's overall estimate of labor costs was appropriate, and so it looked at a number of different pieces of evidence. It relied upon PJM's expert testimony that, specific to the hours, the Stantec hours estimate was actually consistent with hours estimates by two other independent firms. It also noted that Dr. Sackwitz was able to reproduce, nearly reproduce, the market monitor's overall estimate of labor costs, and based on all of that evidence, the commission found that it was an appropriate estimate of labor costs. But didn't the market monitor have a vastly different number for the total labor hours? For total labor hours? For the, I guess, this is very confusing, but I thought that the market monitor report, their input for labor hours was not the one that the commission ultimately accepted, right? I don't think that's right, Your Honor. I think, so the market monitor retained Pasteris Energy to assist with the labor cost estimate. Pasteris retained Stantec. The hours estimate that Stantec came up with was the 360,000 hours number, and so that was the hours figure that was incorporated into the estimate of labor costs that was offered by the market monitor and ultimately proposed by PJM and accepted by the commission. I think what you might be referring to is there's a fairly big difference in the total dollar labor cost estimate offered by the market monitor as compared to that offered by PJM's expert brattle. Yes. And so that's an issue where the stakeholders of PJM were unable to sort of come to a consensus, and they asked the PJM and the market monitor to confer to see if they could reach a consensus, and that's when Dr. Sotkowitz of PJM did his analysis of the market monitor's estimate and found it to be reasonable because it was consistent with PJM's past experience in preparing cost of new entry estimates, and he was able to nearly reproduce it using publicly available data. As I pointed out, the hours estimate offered by the market monitor and Stantec lined up with hours estimates by two other firms. Other questions? Thank you. Mr. Flynn, you have three minutes. Thank you. Paul Flynn for PJM. Very quickly on the cost of capital, the petitioners have seized on this question of the 75% of projects being funded through private equity. I think that what they're trying to get away from is the fact that FERC based its analysis on what it found to be an adequate analysis by PJM. In contrast, they found that the petitioner's analysis was incomplete and was contrary to their precedent, and petitioners have no answer to that. What they mean by incomplete was actually elaborated by PJM's witnesses, who explained that the particular analysis included numbers that they obtained about this 15% to 20% return on equity, but it wasn't clear what the other aspects of the financial numbers that were to go with that were. Cost of capital, you've got debt, you've got equity, and you've got a capitalization ratio split between them, and that data wasn't in the record, so how can you evaluate the reasonableness of an equity number if you don't know what goes along with it in terms of capital structure and debt? And so FERC appropriately found, adopted the position of PJM's, echoed their position that that information was incomplete. They also found that the presentation by petitioners was contrary to FERC precedent. They did this very strange thing where they, FERC has a policy where in some cases you can increase the return on equity above the midpoint so that it's 75% instead of 50%. Here, the petitioner's witnesses took the debt, the equity, and the cash structure and increased all of them up to the 75% level, which was flatly contrary to FERC's precedent. And so FERC noted these things in its orders. They did, I will tell you that the answer to the private equity is so. I'll admit that. But it's there. It's there in several respects. One is that they do acknowledge this hedging question. I don't think it can be sliced quite as fine as petitioners have suggested. The concept there is specified in the testimony at 630, page 75, FERC, page 14 of our witnesses, that a lack of diversification by the company making the investment does not necessarily increase the investment's cost of capital. The point is that ratepayers and customers shouldn't be responsible for awarding a risk premium to a firm that can hedge that risk through hedging tools. And FERC specifically mentioned the hedging tools at paragraph 58 of their order, So, again, it could be more precise and direct, but I think it's in there. I'm afraid you're out of time. Do you have a zinger you want to end here with? On the labor costs? On any topic you want, but you're over time already. The emphasis is being put on Stantec. It should be put on what our witness put in, Dr. Sikevich. He put in an entire analysis. He looked at Bureau of Labor Statistics, public data, and he reproduced. He did his own analysis to reproduce, as close as he could, what the market monitor had come up with. So his basis was the public BLS data and the confirmation that, on the labor hours, the same labor hour value was found by three different independent experts. Stantec, CH2 on Gil, who we hired for the last review of the cost of new entry, and the very witnesses who prepared the analysis in this case. Although they had a higher overall number, they had the same number of labor hours. I'm afraid we're out of time. Thank you. All right. Let the intervener go over a minute. We'll let you go over a minute because you're over already. So go ahead with another minute. Thank you, Your Honor. I should have had 15 minutes in this part. Did I really use it all up? Did you use it all? I'm afraid so. Okay. I'm sorry. It goes so fast. It's so much fun. You did ask me for the site to the 15% to 20%. That's on 480. I want to say about Mr. Sukevich, he did his analysis. Mr. Sukevich is a Ph.D. economist. He is not experienced in the construction industry, so his analysis had to rely upon other values. We talked about the Santec report. I'm sorry. You said 480, did you say? 418. Excuse me. I'm sorry if I said 480. 418. It's at the top of the page, paragraph 21. The CH2M Hill report was found by this commission below, not to have been shown to be just and reasonable. We raised even the same witnesses. PSEG raised the same concerns there. FERC never addressed them, and yet they relied upon that report here as well. The Sargent and Lundy report also referred to, the third firm. We showed through our witnesses that there was a great deal of confusion. You really can't put together the values given Sargent and Lundy's much higher overall labor costs. I want to make a couple of points about the cost of funds, one of which is FERC referred to other sources besides the public or IPPs regarding its values, but all of those values always went back to those very firms. None of those firms were private equity funds. As far as Mr. Flynn says, that hedging related to private equity funds was discussed. I commend you to read our reply brief on that. That simply didn't happen. I'll mention one more thing about the private equity funds, is that FERC here is relying for its wage values on a conglomeration of industries. And that's the Bureau of Labor Statistics data. And if that's not acceptable or acceptable, then I don't see how they could say that the data regarding private equity funds wouldn't be acceptable either. Any questions from the back? Thank you. We'll take a matter under submission.
judges: Garland, Wilkins, Edwards